UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X
RICHARD ALFARO,

                    Plaintiff,

        -against-                          <u>MEMORANDUM AND DECISION</u>
                                           06-CV-1470(JS)(WDW)
BARBARA LABRADOR, BETH WICKEY, ANN
NOWAK, HUBERT PHILLIPS, KEITH
TUTHILL, PAUL HOULIHAN, WILLIAM MEES,
STEVEN FRANO, JONATHAN IRWIN, "JOHN
DOE" and "JANE DONE" #1-5, 6-10 and
11-15, THE TOWN OF SOUTHAMPTON BOARD
MEMBERS comprising THE SOUTHAMPTON
ZONING BOARD OF APPEALS, THE TOWN OF
SOUTHAMPTON DEPARTMENT OF LAND
MANAGEMENT AND ZONING DIVISION, and
THE TOWN OF SOUTHAMPTON

                    Defendants.
------------------------------------X
Appearances:
For Plaintiff:        Concetta Maria Rinaldi, Esq.
                      Andrew J. Campanelli, Esq.
                      Perry & Campanelli, LLP
                      129 Front Street
                      Mineola, New York 11501

For Defendant
William Mees:         Geoffrey H. Pforr, Esq.
                      Robert Howard Cabble, Esq.
                      Andrew J. Mihalick, Esq.
                      Kral, Clerkin, Redmond, Ryan, Perry & Girvan
                      496 Smithtown Bypass, Suite 204
                      Smithtown, NY 1178

For the Southampton
Defendants:           Jeltje DeJong, Esq.
                      David H. Arntsen, Esq.
                      Devitt Spellman Barrett
                      50 Route 111
                      Smithtown, New York 11787


SEYBERT, District Judge:

        Pending before the Court are two motions for summary

judgment, one filed by Defendant William Mees, and the other by the

remaining defendants ("Southampton Defendants"). For the foregoing reasons, Mr. Mees' motion is GRANTED. The Southampton Defendants' motion is GRANTED IN PART AND DENIED IN PART.

<u>BACKGROUND</u>

On August 15, 1997, Richard Alfaro ("Mr. Alfaro"), a Hispanic male, began leasing the premises located at 674 Montauk Highway in East Quogue, New York ("the Property") through Alfaro Motors 35th Avenue Inc., a corporation he controlled. Southampton Def. Stmt. ¶ 1. Mr. Alfaro leased the Property so that he could open and operate an automobile repair shop. Compl. ¶ 8. The Property is zoned "Village Business District," a zoning designation which usually prohibits the operation of an automobile repair shop. Southampton Def. Ex. C. However, Southampton permits new owners and lessees to continue pre-existing non-conforming uses of a property. And here, the Property came with a Certificate of Occupancy dated November 20, 1984, which listed "one concrete block repair garage" as a permitted non-conforming use. Southampton Def. Ex. E. Accordingly, Mr. Alfaro believed that he had a right to operate an automobile repair shop on the Property.

The Property abuts a business known as Hampton Brake and Muffler, which Defendant William Mees owns. Across the street is an automobile shop known as Automagic East. And diagonal to the Property is a repair shop called Loper's Equipment. Like the Property, both Hampton Brake and Muffler and Automagic East lack

proper zoning but have Certificates of Occupancy that permit non-conforming uses. Hampton Brake's Certificate of Occupancy permits "Major Repair of autos and trucks, in wheels, frame, body, brake alignment & mufflers," while Automagic East's permits an "automobile service station." Southampton Def. Exs. Q, R. Mr. Alfaro claims that Hampton Brake and Muffler also operates an on-site junkyard, which Mr. Mees lacks a proper Certificate of Occupancy for. Alfaro Tr. 25:7. Despite this alleged junkyard, Hampton Brake and Muffler, like Automagic East, operates without interference from the town. Loper's Equipment apparently operates without an appropriate Certificate of Occupancy and has correspondingly received numerous zoning-related citations and complaints. Southampton Def. Ex. U.

Mr. Alfaro's problems with Southampton began shortly after his lease commenced. In or about September 1997, Southampton sent Building Inspector Defendant Jonathan Erwin[1] to inspect the Property. Compl. ¶ 50. Mr. Erwin informed Mr. Alfaro that his inspection resulted from a complaint filed with the Southampton Police Department reporting that Mr. Alfaro had illegally changed the Property's use. Compl. ¶ 51. Mr. Erwin's inspection took place before Mr. Alfaro had commenced operation of a repair garage, or any business at all, on the Property. Compl. ¶ 58.

---

[1] Mr. Erwin's last name is incorrectly spelled as "Irwin" in the Complaint and case caption.

Nevertheless, and despite the Property's Certificate of Occupancy permitting the use of "one concrete block repair garage," on October 3, 1997, Southampton issued Mr. Alfaro a Notice of Violation for using "a cement block building . . . as a repair garage." Southampton Def. Ex. F. Although Mr. Mees opposed Mr. Alfaro's plans to use the Property as a repair garage, he did not have any conversations or other communications with Mr. Erwin concerning Mr. Alfaro or the Property. Mees Stmt. ¶ 13. However, Mr. Mees and Mr. Erwin did know each other, and Mr. Erwin had patronized Mr. Mees' business three or four times over the past fifteen to twenty years. Mees Stmt. ¶ 6.

On October 23, 1997, Mr. Alfaro, through his attorney, wrote to the Southampton Building Department to object to the Notice of Violation and to note that the Property's Certificate of Occupancy covered the Property's allegedly improper use as a repair garage. Southampton Def. Ex. G. On October 27, 1997, the Southampton Building Department responded, stating that: (1) the Certificate of Occupancy "further clarifies the repair garage as an accessory to the produce operation"; and (2) this non-conforming use "is abandoned . . . _if_ the use has been discontinued" for a specified time period. Southampton Def. Ex. H (emphasis supplied). But the Southampton Building Department's response did not explain: (1) how the Certificate of Occupancy "clarifies" the Property's use as a repair garage (its plain text contains no such

"clarification"); or (2) whether the Property's non-conforming use had, in fact, been abandoned for the necessary time period.

On November 26, 1997, Mr. Alfaro was issued a citation for operating an auto repair business without a proper Certificate of Occupancy. Southampton Def. Ex. J. ¶ 8. This citation resulted in Mr. Alfaro pleading guilty pursuant to a plea bargain. Id. ¶ 9. As part of that plea bargain, Mr. Alfaro was required to submit an application to the Zoning Board of Appeals ("ZBA"). Id. Thus, in January of 2000, Mr. Alfaro filed such an application with the ZBA seeking: (1) an appeal from the Building Inspector's determination of a violation; and (2) a use variance if the appeal was denied. Id. ¶¶ 1, 9.

The ZBA, consisting of Defendants Barbara Labador, Beth Wickey, Ann Nowak, Hubert Phillips and Keith Tuthill, held three hearings on Mr. Alfaro's application. Id. ¶ 1. Mr. Mees and two elderly women opposed Mr. Alfaro's application for a special use permit. Southampton Def. Stmt. ¶ 66. Mr. Mees retained attorney Doug Penny to assist him with his opposition. Mees Stmt. ¶ 26. In connection with this representation, Mr. Penny wrote to Defendant Paul Houlihan, Southampton's Chief Building Inspector, and testified at the ZBA hearings. Houlihan Tr. 53:22-55:3. Mr. Mees contends that he opposed Mr. Alfaro's application solely due to his own economic interest, because Mr. Alfaro would have competed with him, and denies ever making any racial slurs towards Mr. Alfaro.

Mees Stmt. ¶¶ 25, 27. Mr. Alfaro contends that Mr. Mees was motivated by racial animus, as evidenced by Mr. Mees allegedly referring to Mr. Alfaro as a "F'in spic" and a "spic bastard." Pl. Resp. to Mees Stmt. ¶ 25; Compl. ¶ 45. For purposes of this motion, the Court takes judicial notice of the fact that the term "F'in" is shorthand for a profanity, and that the term "spic" is a derogatory term for Hispanic.

On May 17, 2001, the ZBA made its findings. The ZBA concluded that the Building Inspector correctly interpreted the Certificate of Occupancy, because the Property had only been used to repair the produce business' trucks and the owner's personal vehicles, and had never been used to operate a commercial auto repair business. Southampton Def. Ex. J. ¶ 23. In addition, the ZBA concluded that, even if the Certificate of Occupancy did permit a commercial auto repair business, the Property's use as a repair garage had been abandoned for seven years, precluding the Property's continued non-conforming use as a repair garage. Id. at ¶¶ 24-25. The ZBA then denied Mr. Alfaro's application for a use variance. Id. ¶ 26.

In June 2001, Mr. Alfaro brought an Article 78 challenge to the ZBA's decision in New York Supreme Court, Suffolk County. Southampton Def. Ex. K. On April 16, 2002, the Hon. John JJ Jones, Jr. denied Mr. Alfaro's Article 78 challenge. Southampton Def. Ex. L. On June 3, 2003, the New York Appellate Division, Second

Department, affirmed Justice Jones' decision.

In June 2001, Mr. Alfaro was issued another citation for occupying and using the Property without a proper Certificate of Occupancy, this time by Defendant Steven Frano. Southampton Def. Ex. W. During Mr. Frano's investigation, Mr. Frano obtained permission to park on Mr. Mees' property, and the property of another adjacent owner, for the purposes of observing Mr. Alfaro's activities. Southampton Def. Stmt. ¶¶ 49, 50. Mr. Frano and Mr. Mees were "friendly acquaintence[s]" who sometimes played softball together, and Mr. Frano had patronized Mr. Mees' shop three to five times over the past fifteen to twenty years. Mees Stmt. ¶ 7; Pl. Resp. to Mees Stmt. ¶ 15. Mr. Frano and Mr. Mees apparently discussed the Alfaro case, with Mr. Mees asking him what he was "doing about [it]," but Mr. Frano simply replied that the investigation was on-going. Frano Tr. 84:10-85:15. Mr. Tuthill, a ZBA member and a client of Mr. Mees, also went to observe the Property during this period. Pl. Stmt. ¶ 2. Mr. Mees himself kept a diary detailing Mr. Alfaro's daily activities at the Property, which he later turned over to Southampton. Pl. Stmt. ¶ 3.

On or about April 9, 2003, upon Mr. Frano's application, the Town Justice issued a search warrant for the Property. Southampton Def. Stmt. ¶ 51. On April 10, 2003, Southampton executed the search warrant. Southampton Def. Stmt. ¶ 52. Southampton officials, including Mr. Frano, conducted a four to

five hour search, but were only able to seize stamps, papers belonging to Mr. Alfaro's son, tools, and $300 in cash. Pl. Stmt. at ¶ 4. Southampton has never subjected any other property to the execution of a search warrant or a police raid due to alleged building or zoning code violations. Id. at ¶¶ 5, 6.[2] Mr. Mees was present during the raid, and smiled as it took place. Pl. Resp. to Mees Stmt. ¶ 61b.

Life continued while these legal proceedings took place. During the lease term, Mr. Alfaro used the premises to perform certain motor vehicle repair work and towing operations. Southampton Def. Stmt. ¶ 3. The Southampton Defendants claim that Mr. Alfaro also used the property to store antique cars, but have failed to cite any evidence to that effect. Id. In December 1999, Mr. Alfaro exercised his option to purchase the Property. Compl. ¶ 70. Following his purchase of the Property, Mr. Alfaro used it to repair his own antique cars. Alfaro Tr. at 62:23. Mr. Alfaro also took phone calls at the Property, through which he helped to

_____

[2] Mr. Houlihan's testimony, viewed in the light most favorable to Mr. Alfaro, suggests that Southampton never before executed search warrants or ordered police raids in response to zoning violations. Houlihan Tr. at 56-57. However, Mr. Frano testified that Southampton has executed search warrants in response to zoning violations approximately ten to fifteen times, generally in the context of summer rental houses. Frano Tr. at 31-32. But even Mr. Frano – who has been performing similar responsibilities since 1982 – could not recall an instance where another commercial business was subjected to a search warrant for a zoning violation, and conceded it was "possible" that Mr. Alfaro's case was unique. Frano Tr. at 32.

operate his businesses at other locations. Alfaro Tr. 64:15-21. Mr. Alfaro also moved his friend's vehicle to the Property, following his friend's automobile accident at a nearby location. Pl. Resp. to Southampton Def. Stmt. ¶ 67. And Mr. Alfaro received some windshield deliveries at the Property, and had those windshields put "in." Southampton Def. Stmt. ¶ 68. But Mr. Alfaro is not aware of any other activity taking place at the Property. Alfaro Tr. 67:8. Mr. Alfaro sold the Property in June 2004. Southampton Def. Stmt. ¶ 54.

In March 2006, Mr. Alfaro commenced this case, pleading claims under § 1983 for racial discrimination (Count I), personal animus against him (Count II), lack of due process by delaying his ZBA hearing (Count III), deprivation of property without due process (Count IV), and conspiracy (Count V). On March 28, 2007, the Court dismissed Mr. Alfaro's due process claims, leaving only Counts I, II and V remaining.

<u>DISCUSSION</u>

I. <u>Standard of Review on Summary Judgment</u>

"Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law." <u>Harvis Trien & Beck, P.C. v. Fed. Home Loan Mortgage Corp. (In re Blackwood Assocs., L.P.)</u>, 153 F.3d 61, 67 (2d Cir. 1998) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L.

Ed. 2d 265 (1986); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

"The burden of showing the absence of any genuine dispute as to a material fact rests on the party seeking summary judgment." McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997); see also Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970). "In assessing the record to determine whether there is a genuine issue to be tried as to any material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." McLee, 109 F.3d at 134.

"Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact, once such a showing is made, the non-movant must 'set forth specific facts showing that there is a genuine issue for trial.'" Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000). "Mere conclusory allegations or denials will not suffice." William v. Smith, 781 F.2d 319, 323 (2d Cir. 1986). Similarly, "unsupported allegations do not create a material issue of fact." Weinstock, 224 F.3d at 41.

## II.  Defendant William Mees is Entitled to Summary Judgment

As an initial matter, Mr. Alfaro's claims against Mr. Mees fail. It is undisputed that, during the time in question, Mr. Mees was a private individual and not a Southampton employee or

official.  Under § 1983, private parties such as Mr. Mees can only be held liable upon a showing that the acted "under color of state law."  <u>Nicholas v. Goord</u>, 430 F.3d 652, 656 n. 7 (2d Cir. 2005).  A private party acts "under color of state law . . . when the private actor is a willful participant in joint activity with the State or its agents."  <u>Ciambriello v. County of Nassau</u>, 292 F.3d 307, 324 (2d Cir. 2002) (internal citations and quotations omitted).  In this regard, it is not enough that a private party "merely stand to benefit from an assertion of authority under color of law"; rather, the private party must "act under color of law" such as through a "plan, prearrangement, conspiracy, custom, or policy" with state actors.  <u>Ginsberg v. Healey Car & Truck Leasing, Inc.</u>, 189 F.3d 268, 272-273 (2d Cir. 1999).  For § 1983 purposes, a nominally private party's actions are attributable to the state when: (1) the party acts pursuant to the "coercive power" of the state or is "controlled" by the state ("the compulsion test"); (2) when the state provides "significant encouragement" to the party, the party is a "willful participant in joint activity with the [s]tate," or the party's functions are "entwined" with state policies ("the joint action test" or "close nexus test"); or (3) when the entity "has been delegated a public function by the [s]tate," ("the public function test").  <u>Sybalski v. Indep. Group Home Living Prog., Inc.</u>, 546 F.3d 255, 257 (2d Cir. 2008) (internal citations and quotations omitted).

Here, Mr. Alfaro argues that Mr. Mees was a "state actor" because of an alleged "conspiracy" taken between Mr. Mees and Southampton officials. (Pl. Opp. to Def. Mees. Motion at 6). Specifically, Mr. Alfaro claims that "in furtherance of this conspiracy": Mr. Mees "spewed a multitude of racial slurs at plaintiff in the presence of defendant Town officials," and "hir[ed] a former Town attorney to represent him to vehemently oppose the plaintiff's application before the Town's Zoning Board." Id. at 6-7. Even if these allegations were true, they do not show that Mr. Mees was a state actor. Nothing Mr. Mees did employed the "coercive power" of the state, was closely "entwined" with the state, or amounted to the state delegating a "public function" to him. Sybalski, 546 F.3d at 257. Rather, at most, Mr. Mees petitioned for the state to employ its coercive power against Mr. Alfaro. But Mr. Alfaro does not claim, much less evidence, that Mr. Mees exercised any coercive power himself. Nor does Mr. Alfaro cite anything suggesting that a private citizen's successful request for Government action, through the exercise of his First Amendment petition rights, somehow "entwines" the private party with the Government action that ultimately results, or amounts to a "delegation" of Government power to the petitioner.[3] Thus, Mr.

_____

[3] The First Amendment precludes Congress from making any law that "abridg[es] . . . the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. CONST. AMEND. I. Accordingly, even if Mr. Mees' petitioning for the state to take action could somehow be

Mees was not a state actor for § 1983 purposes.

Mr. Alfaro's claims predicated on a § 1983 and § 1985 conspiracy theory (rather than Mr. Mees' own alleged "state act[ion]") fair no better. To prove a § 1983 conspiracy, Mr. Alfaro must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages. Pangburn v. Culbertson, 200 F.3d 65, 72 (2d Cir. 1999). Here, Mr. Alfaro has produced zero evidence that Mr. Mees reached any "agreement" with Southampton or its officials. At most, Mr. Alfaro has set forth unsubstantiated innuendo that such an agreement must have existed because Mr. Mees: (1) knew several of the individual Southampton

_____

considered state action itself, Mr. Mees would likely have immunity from Mr. Alfaro's claims under the First Amendment and the Noerr-Pennington doctrine. Barnes Foundation v. Township of Lower Merion, 242 F.3d 151, 158 (3d Cir. 2001) (finding that the "Noerr-Pennington doctrine provides an immunity for First Amendment activity allegedly constituting a civil rights abuse" even when "a racially discriminatory animus allegedly motivated the activity"); but see LeBlanc-Sternberg v. Fletcher, 781 F. Supp. 261, 267 (S.D.N.Y. 1991) (holding that the First Amendment does not protect petitioning motivated by discriminatory animus). Similarly, the First Amendment protects Mr. Mees' right to use racial slurs during a private dispute, such as a feud with his neighbor Mr. Alfaro. See Million Youth March, Inc. v. Safir, 63 F. Supp. 2d 381, 391 (S.D.N.Y. 1999) ("hateful, racist, and offensive speech . . . is entitled to First Amendment protection").

Defendants personally or professionally; and (2) personally opposed Mr. Alfaro's operation of a repair shop; while (3) supposedly being in violation of Southampton's zoning code himself. Pl. Opp. to Def. Mees Motion at 7. But "conclusory allegations and unsubstantiated statements are insufficient to survive" summary judgment on a § 1983 and § 1985 conspiracy claim, where "the record is devoid of any proof of an agreement among Defendants to act in concert to violate Plaintiffs' constitutional rights." Rose v. Julliano, 05-CV-2732, 2008 WL 5233178, *7 (E.D.N.Y. Dec. 8, 2008); Celestin v. City of New York, 581 F. Supp. 2d 420, 434 (E.D.N.Y. 2008) (summary judgment appropriate because "there is no evidence to suggest that an agreement existed among the officers to violate the plaintiff's constitutional rights").

Accordingly, Mr. Mees is entitled to summary judgment.[4]

III. <u>The Southampton Defendants' Summary Judgment Motion is Granted in Part</u>

A. <u>Most of Mr. Alfaro's Claims are Time Barred</u>

The parties agree that Mr. Alfaro's claims are subject to

_____

[4] Mr. Mees also contends that summary judgment is also appropriate because Mr. Alfaro's claims against him violate New York's Strategic Lawsuits Against Public Participation ("SLAPP") statute. <u>See</u> N.Y. Civ. Rights L. § 70-a. But § 70-a does not provide a defendant with grounds for summary judgment. Rather, it permits a defendant to "maintain an action, claim, cross claim or counterclaim to recover damages, including costs and attorney's fees" against any plaintiff who files a suit seeking to chill public petitioning and participation. <u>Id.</u> Here, Mr. Mees has not asserted any SLAPP "action, claim, cross claim or counterclaim" against Mr. Alfaro. Therefore, the Court does not consider his SLAPP-related arguments.

a three-year statute of limitations, because § 1983's statute of limitations depends on state law, and New York imposes a three-year limit on civil rights claims.  Southampton Def. Motion at 6; Alfaro Opp. to Southampton Def. Motion at 8.  Here, Mr. Alfaro filed his Complaint on March 30, 2006.  Thus, the Southampton Defendants argue that all of Mr. Alfaro's claims based on events that preceded March 30, 2003 are time-barred.  Mr. Alfaro counters that the Southampton Defendants' conduct amounted to a "continuing violation" which tolled the limitations period.  But Mr. Alfaro's argument is not persuasive.

Under Second Circuit law, "[t]he crucial time for accrual purposes is when the plaintiff becomes aware that he is suffering from a wrong for which damages may be recovered in a civil action. To permit him to wait and toll the running of the statute simply by asserting that a series of separate wrongs were committed pursuant to a conspiracy would be to enable him to defeat the purpose of the time-bar, which is to preclude the resuscitation of stale claims." Singleton v. City of New York, 632 F.2d 185, 192 (2d Cir. 1980). In his opposition to the Southampton Defendants' summary judgment motion, Mr. Alfaro's counsel contends that Mr. Alfaro did not know he was being discriminated against until April 10, 2003, when Southampton raided the Property.  Alfaro Opp. to Southampton Def. Mot. at 11-12.  But Mr. Alfaro cites no evidence to support this contention.  And – contrary to counsel's representations – Mr.

Alfaro's deposition testimony clearly indicates that he first believed that he was being discriminated against "when I realized that Mees was . . . the only opposition that I had [to his Certificate of Occupancy]" which occurred "right after I got the summons." Alfaro Tr. 70:4-9. This took place sometime between 1997 (when Mr. Alfaro first received a notice of violation) and 2000 or 2001, when Mr. Mees opposed Mr. Alfaro's petition before the ZBA. Because it is well-settled that a party's statement "which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment," this Court must ignore counsel's unsupported claim that Mr. Alfaro did not suspect discrimination until 2003, and instead credit Mr. Alfaro's deposition testimony – which establishes that Mr. Alfaro first thought he was being discriminated against sometime in 2001 or earlier. Buttry v. Gen. Signal Corp., 68 F.3d 1488, 1493 (2d Cir. 1995). And, consequently, Mr. Alfaro cannot establish that he suffered any "continuing violation." Thus, the Southampton Defendants' motion for summary judgment is GRANTED with respect to all conduct that took place before March 30, 2003. It follows then that summary judgment is also granted in full to Defendants Labador, Wickey, Phillips, Tuthill,[5] Erwin, Houlihan[6] and the

---

[5] Mr. Alfaro claims that Mr. Tuthill went to his property at night to inspect it. Pl. Stmt. ¶ 2; Alfaro Tr. 56. Based on the transcript, it appears that Mr. Tuthill's night-time visits took place in connection with his role on the ZBA, and are thus time-barred. If, however, Mr. Alfaro contends that Mr. Tuthill

Southampton Zoning Board of Appeals, whose allegedly wrongful conduct all entirely predated March 30, 2003.

The Southampton Defendants also argue that Mr. Alfaro's claims relating to the police raid that took place on April 10, 2003 are time-barred. The Southampton Defendants claim that the raid "was merely a procedure that flowed from the 2001 criminal prosecution." Southampton Def. Br. at 9. This argument is not persuasive. As an initial matter, the Southampton Defendants have provided zero factual support for their claim that the raid "merely . . . flowed" from Mr. Alfaro's long concluded criminal prosecution. But even if the raid really did "flow[]" from proceedings that took place in 2001, it is indisputable that the raid did not occur until April 10, 2003 – several days after the beginning of the timely period. Accordingly, the Southampton Defendants' argument that claims relating to the raid are time-barred is frivolous. Thus, Mr. Alfaro's claims against Mr. Frano,

---

continued to visit the Property after the ZBA proceedings concluded, in connection with the search warrant and raid, the Court will grant him leave to file a motion to reconsider the Court's award of summary judgment in Mr. Tuthill's favor. The Court cautions Mr. Alfaro, however, that any such motion for reconsideration must be based on a good faith belief – supported by admissible evidence – that Mr. Tuthill played some direct or indirect role in the raid. If Mr. Alfaro baselessly attempts to bring Mr. Tuthill back into this case, sanctions may be appropriate. See FED. R. CIV. P. 11.

[6] Mr. Houlihan's term as Southampton's Chief Building Inspector ended in August of 2001, when he became West Hampton Beach's Chief Building Inspector. Houlihan Tr. at 5-6.

the Town of Southampton, and the Town of Southampton Department of Land Management and Zoning Division  may proceed (hereafter, the "Remaining Southampton Defendants").[7]

B.  The Remaining Southampton Defendants are Entitled to Summary Judgment on Mr. Alfaro's Racial Discrimination Claim

Count I of the Complaint alleges that the Defendants denied Mr. Alfaro equal protection of the law by racially discriminating against him.  To establish such a claim, Mr. Alfaro must show: (1) that he was treated differently from other similarly situated individuals, and (2) that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.  See Harlen Assoc's v. Incorporated Village of Mineola, 273 F.3d 494, 499 (2d Cir. 2001).

For summary judgment purposes, Mr. Alfaro has satisfied the first prong of this test.  It is undisputed that several other properties in Southampton contained enforceable zoning violations,

---

[7] The Southampton Defendants contend that the Town of Southampton Department of Land Management and Zoning Division is just an administrative agency of the Town of Southampton, and thus not susceptible to suit.  See, generally, S.W. by J.W. v. Warren, 528 F. Supp. 2d 282, 302-03 (S.D.N.Y. 2007).  But the Southampton Defendants did not include this contention in their Rule 56.1 Statement, and provide no evidentiary support for it in their briefs.  Thus, for now, Mr. Alfaro's claim against the Southampton Department of Land Management and Zoning Division survives.

including Loper's Equipment, and potentially Hampton Brake & Muffler. But, other than Mr. Alfaro, Southampton has not subjected anyone to search warrants or police raids for zoning violations. Pl. Stmt. ¶¶ 6, 7. Indeed, in deposition, Mr. Houlihan testified that he could not think of a single other incident in which a building or zoning code violation led to a search warrant. Houlihan Tr. at 56-57. And, at least for purposes of this motion, Southampton's targeted enforcement against Mr. Alfaro is more striking because, in contrast to other zoning violators, Mr. Alfaro was allegedly not running an improperly zoned business at the time of the search warrant and raid. Thus, Mr. Alfaro has shown that he was treated differently from similarly situated individuals.

Mr. Alfaro has not, however, shown that he was treated differently due to impermissible racial considerations. Mr. Alfaro has produced no direct or circumstantial evidence suggesting that any Southampton Defendant (rather than the private party, Mr. Mees) had racial animus towards Mr. Alfaro. Indeed, Mr. Alfaro himself tacitly concedes that he has no evidence supporting an inference that Southampton or its employees engaged in racial discrimination against him. In his opposition to the Southampton Defendants' Motion for Summary Judgment at 12-13, Mr. Alfaro argues only that "discriminatory treatment was committed by co-conspirator William Mees," and then makes an unsupported speculative jump that "[s]uch racial discrimination . . . was the motivation behind enforcement

19

of the laws of Southampton." But a party cannot defeat summary judgment through "rank speculation" of racial animus. <u>Finkelshteyn v. Staten Island University Hosp.</u>, 06-CV-4774, 2009 WL 935744, *12 (E.D.N.Y. March 31, 2009) (rejecting plaintiff's argument that "Casella's animus must be Pitta's animus"). Therefore, the remaining Southampton Defendants are entitled to summary judgment on Count I of Mr. Alfaro's Complaint.

C. <u>Mr. Alfaro's "Class of One" Count Survives</u>

Mr. Alfaro argues that "should the Court find that there is not sufficient evidence to sustain a § 1983 claim based upon a violation of equal protection that is racially motivated, at the very least, absent a suspect class, plaintiff is a 'class of one' and, based upon this, was discriminated against." Pl. Opp. to Southampton Def. Motion at 14. In his Complaint, this claim appears as Count II, in which Mr. Alfaro alleges a violation of equal protection based on "personal animus against him."

The Supreme Court has recognized the existence of a "class of one" equal protection cause of action against a municipality for arbitrary or irrational application of property laws. In <u>Village of Willowbrook v. Olech</u>, 528 U.S. 562, 564-65, 120 S. Ct. 1073, 145 L. Ed. 2d 1060 (2000), the Supreme Court held that a property owner stated a valid "class of one" cause of action by pleading that the defendant Village had demanded a 33 feet easement as a condition for connecting her property to the

municipal water supply while similarly situated property owners needed to only grant a 15 foot easement, and that "there was no rational basis for the difference in treatment."

Applying Village of Willowbrook, the Second Circuit has held that "class-of-one plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves," and that this burden "is more stringent than that used at the summary judgment stage in the employment discrimination context." Clubside, Inc. v. Valentin, 468 F.3d 144, 159 (2d Cir. 2006) (Sotomayor, J.). This is because a class of one plaintiff must show that he "was intentionally singled out for reasons that so lack any reasonable nexus with a legitimate governmental policy that an improper purpose-whether personal or otherwise-is all but certain." Id. (internal quotations or citations omitted). Thus, to succeed on a class of one claim, a plaintiff must establish: (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake. Id. That being said, "whether parties are similarly situated is a fact-intensive inquiry." Id. Thus, a court may grant summary judgment in the defendant's favor only "where no

reasonable jury could find that the persons to whom the plaintiff compares itself are similarly situated." Id.

Roughly a year ago, the Supreme Court decided Engquist v. Oregon Dep't of Agric., __ U.S. __, 128 S. Ct. 2146, 2154, 170 L. Ed. 2d 975 (2008), in which it held that "class of one" claims cannot be brought in the public employment context, given the highly discretionary and individualized way in which employment decisions are made. More generally, the Court recognized that class of one claims cannot be brought to challenge "some forms of state action, however, which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments . . . In such situations, allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise." Id. The Supreme Court expressly cited certain kinds of law enforcement as an example, noting that a traffic officer might give "only one" speeder a ticket, but that this selective enforcement does not create a "class of one." Id. Interpreting Engquist, several Second Circuit district courts have identified another element that a prospective "class of one" plaintiff must satisfy: "that the differential treatment resulted from non-discretionary state action." See, e.g., Seymour's Boatyard, Inc. v. Town of Huntington, 08-CV-3248, 2009 WL 1514610, *7 (E.D.N.Y. June 1, 2009); see also Tarantino v. City of Hornell, 615 F. Supp.

2d 102, 112 (W.D.N.Y. 2009) (recognizing an identical third element of a class of one claim); <u>Balakrishnan v. Kusel</u>, 08-CV-1440, 2009 WL 1291755, *5 (E.D.N.Y. May 8, 2009).  And, applying <u>Enqquist</u>, two circuits have held that class of one claims cannot be raised in the law enforcement context.  <u>Flowers v. City of Minneapolis</u>, 558 F.3d 794, 799-800 (8th Cir. 2009) ("while a police officer's investigative decisions remain subject to traditional class-based equal protection analysis, they may not be attacked in a class-of-one equal protection claim"); <u>United States v. Moore</u>, 543 F.3d 891, 901 (7th Cir. 2008) (class of one claims cannot challenge the exercise of prosecutorial discretion); <u>see</u> <u>also</u> <u>Tarantino</u>, 615 F. Supp. 2d at 117 (finding that a class of one claim cannot be used to challenge the enforcement of a rental property ordinance).

There is some disagreement, however, on how far <u>Enqquist</u> restricts "class of one" claims.  In <u>Balakrishnan</u>, for instance, the Court granted defendants summary judgment on plaintiff's "class of one" equal protection cause of action, but denied summary judgment on plaintiff's selective enforcement cause of action predicated on plaintiff's "class of one" status.  In so doing, <u>Balakrishnan</u> found that plaintiff survived summary judgment on a quasi-law enforcement claim, concerning the scope of Department of Health investigations into "the alleged regulatory violations committed by plaintiff or the laboratories he directed," and a lengthy "hold" placed on the renewal of plaintiff's certification

to perform certain kinds of testing.  <u>Balakrishnan</u>, 2009 WL 1291755 at *7.  The Court noted that plaintiff's certification had been on "hold" for substantially longer than other individuals under investigation, and that the Department of Health's investigation of plaintiff was "longer, more in-depth, or otherwise different from the investigations of the other laboratory directors."  <u>Id.</u>  Thus, the Court concluded that plaintiff had established triable issues of fact on his selective enforcement claim.  <u>Id.</u>

Considering the case at hand, and the established case law, the Court respectfully disagrees with the Eighth and Seventh Circuits that class of one claims can <u>never</u> be brought in the law enforcement context.  These holdings appear to derive from the Supreme Court's hypothetical concerning a traffic officer who must make discretionary determinations regarding whom to ticket for speeding – ticketing one speeder, but not others.  The problem with this hypothetical, at least with respect to Mr. Alfaro's claim, is that while an individual officer might only ticket one speeder on one particular occasion, it is indisputable that many speeders get tickets, while many others do not, with no clear standards in place to determine who gets ticketed.  In such a circumstance, where a law is selectively enforced (without clear standards for enforcement) against some people but not others, a class of one claim inappropriately interferes with the discretionary decision making process that a law enforcement officer or body must engage

24

in.

On this point, _Engquist_'s discussion of "discretionary" decisions in the _Village of Willowbrook_ context is instructive. _Engquist_'s discussion of _Village of Willowbrook_ appears to define "discretionary" decisions, for the purpose of barring "class of one" claims, as those that involve discretion that is actually exercised on a _day-by-day_ basis, rather than decisions that are theoretically discretionary but – as a practical matter – actually depend on _de facto_ standards. Specifically, _Engquist_ distinguished _Village of Willowbrook_ based on the Court's understanding that the Village of Willowbrook's zoning board was not "exercising discretionary authority based on subjective, individualized determinations." _Engquist_, 128 S. Ct. at 2153. Rather, the Supreme Court commented, the fact that every other property owner had been required to give an identical easement – 15 feet – demonstrated "the existence of a clear standard against which departures, even for a single plaintiff, could be readily assessed." _Id._ But _Engquist_ does not claim, and _Village of Willowbrook_, does not evidence, that the "clear standard" alluded to was an _official_ standard which constrained the zoning board's power. Nor does _Engquist_ claim, or _Village of Willowbrook_ suggest, that the zoning board lacked the statutory authority to treat some property owners different than others (that is, after all, what zoning boards frequently do). Rather, the "clear standard" that

*Engquist* references appears to have emerged from the zoning board's consistent pattern and practice – that, at a practical level, it had <u>not</u> exercised its statutory discretion on a case-by-case basis but instead had required the same standard for everyone.[8]  So to here: the issue is not whether Southampton lacked the theoretical discretionary power to enforce its zoning code through search warrants and police raids.  It's the fact, accepted as true for purposes of this motion, that it had <u>never</u> exercised that power <u>except</u> against Mr. Alfaro, placing Mr. Alfaro in a class all by himself amongst zoning code violators.  So, viewing the facts in the light most favorable to Mr. Alfaro, Southampton – much like the Village of Willowbrook – had a de facto "clear standard" on how to handle zoning violations – which avoided the use of search warrants and police raids – and violated that standard by peculiarly targeting Mr. Alfaro.  And thus, for purposes of this motion, the Court holds that – even if class of one claims cannot challenge discretionary decisions – Southampton's actions here were not

_____

[8] By hypothetical: assume that a state statute prohibiting robbery permits a municipality to charge a teenage offender as either a minor or as an adult.  Further assume that, over the past 10 years, the municipality had acted under a <u>de</u> <u>facto</u> policy to never charge minors as adults for that particular offense, and thus had uniformly prosecuted hundreds of substantially similar offenders as minors, <u>never</u> prosecuting even one minor offender as an adult.  If that overall policy continued, but a prosecutor singled out a <u>single</u> minor offender to charge as an adult simply because the prosecutor irrationally disliked him, would <u>Engquist</u> completely foreclose such a "class of one" claim?  The Court does not think so.

"discretionary" enough to bar Mr. Alfaro's claim.

That being said, Mr. Alfaro, like all class of one plaintiffs, must still establish the other two prongs of a class of one claim, that: (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake. Clubside, Inc., 468 F.3d at 159. But for purposes of this motion, Mr. Alfaro satisfies both criteria.

First, the undisputed facts establish that at least one business in close proximity to Mr. Alfaro's engaged in similar, albeit not identical, zoning violations – Loper's Equipment. See Southampton Def. Ex. U. And Mr. Alfaro testified that his next door neighbor, Hampton Brake & Muffler, operated an illegal junkyard which its Certificate of Occupancy indisputably did not permit. Mindful of the fact that whether two parties are "similarly situated is a fact-intensive inquiry," and that the Court should only grant summary judgment "where no reasonable jury could find that the persons to whom the plaintiff compares itself are similarly situated," the Court believes that a reasonable jury could consider Loper's Equipment and Hampton Brake & Muffler similarly situated to Mr. Alfaro. Clubside, Inc., 468 F.3d at 159.

Both these businesses are on the same block as the Property and, for purposes of this motion, both engaged in zoning violations that did not lead to the execution of search warrants or police raids.

Second, the Southampton Defendants have not even attempted to set forth any rational basis or legitimate government policy to explain why they targeted Mr. Alfaro through the execution of a search warrant or a police raid, but not any other zoning violator (including Loper's Equipment or Hampton Brake & Muffler). In this regard, the Court can take judicial notice of the fact that zoning violations are common, and that there were likely dozens, if not hundreds, of zoning violators within Southampton during the time period in question. See Kagen v. I.R.S., 71 F.3d 1018, 1021 (2d Cir. 1995) ("Courts in general have long taken judicial notice of facts of common knowledge").[9] Indeed, at his deposition, Southampton's Chief Building Inspector, Mr. Houlihan acknowledged that he had "no idea" regarding how many zoning code investigations or summonses he was involved in between 1997 and 2001 – suggesting a sizeable number. Houlihan Tr. 14-15. For purposes of this motion, Southampton has not contended that Mr.

_____

[9] Indeed, a Westlaw search revealed several zoning disputes in recent years which have led to court decisions. See, e.g., Downing v. Charos, Case No. 2006-35225, 2007 WL 4439434 (Table) (N.Y. Sup. Ct., Suffolk County 2007); Lafiteau v. Guzewicz, Case No. 06-19664, 831 N.Y.S.2d 354 (Table) (N.Y. Sup. Ct., Suffolk County 2006) (concerning the granting of a special use permit to cure on-going violations); Town Bd. of Town of Southampton v. Credidio, 21 A.D.3d 547, 800 N.Y.S.2d 732 (2d Dep't 2005). Undoubtedly, most zoning code violations never reach this stage.

Alfaro's violations were more severe, or articulated any other reason why it treated Mr. Alfaro more severely than all the other zoning violators in the Town. Accordingly, a reasonable jury could find that "no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy." Clubside, Inc., 468 F.3d at 159. And thus, Mr. Alfaro meets the first prong.

Furthermore, the Southampton Defendants do not even claim that they targeted Mr. Alfaro by "mistake." Thus, given the relative similarity in circumstances between Mr. Alfaro and other zoning violators, and the relative dissimilarity in how Southampton treated him, a reasonable jury could also "exclude the possibility that the defendants acted on the basis of a mistake." Id.

It follows that Mr. Alfaro's "class of one" equal protection claim survives summary judgment.

D. The Remaining Southampton Defendants are Entitled to Summary Judgment on Mr. Alfaro's Conspiracy Claim

The Remaining Southampton Defendants are entitled to summary judgment on Mr. Alfaro's conspiracy claim brought under 42 U.S.C. § 1985. Mr. Alfaro has adduced no evidence that the Remaining Southampton Defendants entered into any kind of agreement to deny him equal protection of the law. And, "[i]n order to maintain an action under Section 1985, a plaintiff must provide some factual basis supporting a meeting of the minds, such that

29

defendants entered into an agreement, express or tacit, to achieve the unlawful end." Webb v. Goord, 340 F.3d 105, 110 (2d Cir. 2003). Therefore, the Remaining Southampton Defendants are entitled to summary judgment on Mr. Alfaro's conspiracy claim.

In addition, as noted above, the Remaining Southampton Defendants consist of a Southampton employee (Mr. Frano), Southampton itself, and an apparent Southampton government body. And it is well-established that "[u]nder the intracorporate conspiracy doctrine, officers, agents and employees of a single corporate entity are legally incapable of conspiring together." Hartline v. Gallo, 546 F.3d 95, 99 n.3 (2d Cir. 2008). The intracorporate conspiracy doctrine further "bars conspiracy claims alleging concerted action by employees and/or the heads of various departments within a single municipal entity, at least where the complaint fails to allege that the various [municipal] entities were effectively acting as separate entities in carrying out the alleged conspiracy." Broich v. Incorporated Village of Southampton, 08-CV-0553, 2009 WL 2225306, *9 (E.D.N.Y. 2009) (internal citations and quotations omitted). Here, because the remaining defendants are all part of the same municipal entity – the Town of Southampton – summary judgment is also proper on the basis of the intracorporate conspiracy doctrine.

E.    Qualified Immunity

The doctrine of qualified immunity shields government

officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights." <u>Ashcroft v. Iqbal</u>, __ U.S. __, 129 S. Ct. 1937, 1945, 173 L. Ed. 2d 868 (2009). To establish qualified immunity, defendants must "show either that their conduct did not violate clearly established rights of which a reasonable person would have known, or that it was objectively reasonable to believe that [their] acts did not violate these clearly established rights." <u>Prue v. City of Syracuse</u>, 26 F.3d 14, 17 (2d Cir. 1994).

Here, the Southampton Defendants argue that Mr. Frano is entitled to qualified immunity because he was engaged in discretionary functions, and it was objectively reasonable for him to believe that his actions did not violate Mr. Alfaro's rights. Mr. Frano is entitled to qualified immunity on the latter ground.

The timely conduct alleged against Mr. Frano consists of Mr. Frano's role in obtaining a search warrant and facilitating a police raid on Mr. Alfaro's property, thereby selectively enforcing Southampton's zoning code against a "class of one." These actions took place in 2003. But even today, several years after the search warrant and raid, the law concerning "class of one" claims is muddled. As discussed above, two circuits (the Eighth and the Seventh) have effectively held that plaintiffs' cannot assert "class of one claims" in the law enforcement context (<u>e.g.</u>, here, a search warrant and raid). And, although this Court disagrees

31

with drawing any bright line rule, the fact that two circuit courts would bar Mr. Alfaro's claim (while the Second Circuit has yet to speak) demonstrates that Mr. Frano's actions did not violate any of Mr. Alfaro's "clearly established rights." <u>Prue</u>, 26 F.3d at 17.

In addition, the fact that the Town Justice signed off on the search warrant creates a presumption that Mr. Frano's conduct "was objectively reasonable." <u>Martinez v. City of Schenectady</u>, 115 F.3d 111, 115 (2d Cir. 1997). And, to rebut that presumption, Mr. Alfaro "must make a 'substantial preliminary showing' that the affiant knowingly and intentionally, or with reckless disregard for the truth" obtained the search warrant through "a false statement in his affidavit and that the allegedly false statement was 'necessary to the finding of probable cause.'" <u>Lynch ex rel. Lynch v. City of Mount Vernon</u>, 567 F. Supp. 2d 459, 466 (S.D.N.Y. 2008) (internal citations and quotations omitted). Here, Mr. Alfaro has failed to do so.

Thus, Mr. Frano is entitled to summary judgment on the issue of qualified immunity. Consequently, Mr. Alfaro may proceed to trial only against the Town of Southampton and the Town of Southampton Department of Land Management and Zoning Division.[10]

---

[10] The Southampton Defendants did not move for summary judgment on Mr. Alfaro's <u>Monell</u> claim against the municipality. However, to prevail at trial, Mr. Alfaro must prove the Complaint's allegation that Mr. Frano "was clothed with the authority to make official government policy, and laws, on behalf of Southampton." Compl. ¶ 168; <u>See</u> <u>Messner v. Calderone</u>, 07-CV-0893, 2008 WL 696909, *4 (N.D.Ill. 2008) (permitting a class of

<u>CONCLUSION</u>

Mr. Mees' motion for summary judgment is GRANTED in full. The Southampton Defendants' motion for summary judgment is GRANTED in part and DENIED in part. Specifically: (1) Defendants Labrador, Wickey, Nowak, Phillips, Houlihan, Erwin and the Southampton Board Members comprising the Southampton Zoning Board of Appeals are awarded full summary judgment; (2) Defendants the Town of Southampton and the Town of Southampton Department of Land Management and Zoning Division are awarded summary judgment on Counts I and V of the Complaint; and (3) with respect to Count II of the Complaint, Defendants the Town of Southampton and the Town of Southampton Department of Land Management and Zoning Division are awarded summary judgment with respect to all conduct that took place on or before March 30, 2003.

Plaintiff Richard Alfaro may proceed to trial only against the Town of Southampton and the Southampton Department of Land Management and Zoning Division, and only with respect to Count

---

one plaintiff to assert a <u>Monell</u> claim based upon a mayor's allegedly illegal orders). Municipalities cannot be held liable under § 1983 "by application of the doctrine of <u>respondeat superior</u>." <u>Roe v. City of Waterbury</u>, 542 F.3d 31, 36 (2d Cir. 2008). And, although a municipality can face liability based on its customs or practices, such a theory is fundamentally inconsistent with Mr. Alfaro's "class of one" status, at least when Mr. Alfaro's claims depend on only a few events. <u>See</u>, <u>generally</u>, <u>McDorman v. Smith</u>, 05-CV-0448, 2006 WL 2355574, *7-8 (N.D. Ill. 2006) (recognizing the inherent tension between a <u>Monell</u> claim and a "class of one" claim, but permitting a plaintiff to assert both claims at the pleading stage, noting that plaintiffs are permitted to plead inconsistent claims).

II's "class of one" claim predicated on conduct that postdates March 30, 2003.

                                SO ORDERED


                                /s/ JOANNA SEYBERT
                                Joanna Seybert, U.S.D.J.

Dated:     Central Islip, New York
           August  14 , 2009